UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HARRIETT ELLIS, TIA MARTIN, | ) | |
| DELORES MCNEIL, ANONI ELMORE, | ) | |
| PATRICIA FORREST, SHAVON JONES, | ) | |
| TIFFANY GRIFFEN and KAREN | ) | |
| CHERRY, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-254-SEB-DML |
| | ) | |
| CCA OF TENNESSEE, LLC d/b/a | ) | |
| CORRECTIONS CORPORATION OF | ) | |
| AMERICA, | ) | |
| Defendant. | ) | |

**ENTRY ON SUMMARY JUDGMENT MOTION**

This case is before the Court on the motion for summary judgment filed by

Defendant, CCA of Tennessee, LLC d/b/a Corrections Corporation of America ("CCA").

Plaintiffs, eight former employees of CCA, have sued the company claiming that they

were subject to:  a racially hostile and unsafe work environment, intimidation and

retaliation for complaining of unprofessional and unethical conduct, intentional infliction

of emotional distress, and that this conduct towards them eventually led to their

constructive discharges from their employment.  Defendant's defenses are nearly as

numerous as Plaintiffs' theories of recovery in their twelve-count Third Amended

Complaint.  Having considered the viability of each of Plaintiffs' claims, for the reasons

expressed in this entry, we grant CCA's motion and direct the entry of final judgment in favor of CCA.

### *Factual Background*

CCA operates a private correctional facility referred to as the Marion County Jail II or Marion Jail #2 ("Jail" or "Jail II").  It is a medium security correctional facility located in Indianapolis, Indiana.  CCA operates and manages Jail II pursuant to a contract with the Marion County Sheriff.  In order to provide necessary medical services to the inmates housed in the Jail, CCA employs a medical staff consisting of a facility doctor, psychologists and nurses.  CCA's workforce at the Jail, in general, has consistently included minority employees at a level of approximately 50%.  All of the Plaintiffs in this action are African Americans, who were employed as nurses and served as part of the medical services staff at Jail II.

At the time Plaintiffs were hired, each signed an acknowledgment that her employment was at will and not pursuant to any employment contract.  The employment tenure of each Plaintiff is set forth below, in the order of each Plaintiff as listed in the caption.

| PLAINTIFF | HIRE DATE | RESIGNATION DATE |
|-----------|-----------|------------------|
| Harriet Ellis | May 19, 2003 | September 29, 2006 |
| Tia Martin | June 10, 2003 | September 28, 2006 |
| Delores McNeil | May 10, 2004 | January 6, 2007 |

| Aloni Elmore | June 17, 2003 | October 2006 |
| Patricia Forrest | September 1999 | October 2, 2006 |
| Shavon Jones | May 30, 2002 | September 8, 2006 |
| Tiffany Griffen | July 1, 2005 | October 11, 2006 |
| Karen Cherry | April 2003 | May 31, 2005 |

In early 2005, CCA's Health Services Regional Director was Mary Garner, the Jail Warden was David Gilpin and the Health Services Administrator was Carmen Copely. During that time, the Jail nurses were permanently assigned to one of three shifts and there were no pay differentials among the shifts. All but one of the nurses on the day shift were African American. Tensions sometimes arose between and among the shifts, when nurses assigned to one shift would complain that those assigned to the other two shifts were slacking off on their work or were being favored in some manner by management. Sometimes the complaints might include an allegation that nurses on one shift or another were benefitting from race-based favoritism. In an attempt to reduce the continuing tensions among the shifts, Mary Garner, herself an African American, called a meeting in May 2005 at which she announced that, henceforth, all nurses would be assigned to rotating shifts. This policy of rotating twelve-hour shifts still remains in effect.

CCA employees have three alternative routes by which to register formal complaints within the company.  They can complain to their local or corporate headquartered supervisors; they can take advantage of a grievance process; or they can fill out and submit a "5-1C" form  to report specific problems or incidents of alleged improper treatment.  During their employment, Plaintiffs sometimes completed 5-1C forms to report medication errors, safety concerns and offensive language, but none of the three avenues for registering a complaint was utilized by any of the Plaintiffs to report racial discrimination.[1]

On May 27, 2005, Plaintiff Patricia Forrest[2] filed a charge of discrimination with the EEOC complaining of having been removed from the first shift and, in February of that year, having been passed over for a younger Caucasian male nurse from the second shift who was awarded a pharmacy technician position for which she had applied. Thereafter, in July of 2005, another nurse lodged a complaint against Ms. Forrest, accusing her of having negatively discussed with other nurses and a drug-store pharmacist the propriety of that nurse's use of a particular type of syringe, which use Administrator

_____

[1]Plaintiff Shavon Jones testified by deposition that she believed she had filed a written complaint of race discrimination, but was uncertain of the person she may have given it to and CCA has no record of such a written complaint.

[2]Ms. Forrest was Plaintiff in her own separate discrimination lawsuit against CCA wherein she asserted claims of race, gender and age discrimination as well as retaliation. Summary judgment was entered in favor of CCA in that lawsuit, *see Forrest v. Corrections Corporation of America,* 2008 WL 111001 (S.D. Ind. Jan 7, 2008) and in recounting her factual circumstances here we have drawn from certain of the relevant findings of fact in that case.

Copely had previously specifically approved.  Ms. Copely met with Ms. Forrest to inform her of the complaint and to instruct her to cease all further discussions about the incident and also to remind Ms. Forrest not to retaliate against anyone for having brought Ms. Forrest's conduct to Ms. Copely's attention.  Thereafter, Ms. Forrest proceeded to violate these instructions, indeed, she did so on the very day she had been admonished, resulting in her receiving a disciplinary write-up.  When Ms. Forrest again violated this very same prohibition against confronting other nurses in her efforts to determine who had "ratted her out," Warden Gilpin terminated Ms. Forrest's employment on August 9, 2005.

Ms. Forrest successfully availed herself of the CCA grievance process following her termination and was awarded reinstatement with back-pay.  However, she was unsuccessful in her pursuit of the discrimination charge before the EEOC and in her discrimination claims in the individual lawsuit which she filed in this Court.

In April 2006, Tim Little replaced Carmen Copely as Administrator of the Jail's health services, and shortly thereafter Jeff Conway became Warden in place of David Gilpin.  Following Ms. Copely's departure, when her office area was being cleaned out in preparation of her successor's arrival on duty,  a six page excerpt from a book was found among her things.  The excerpt contained a sketch depicting a manager seated at a desk with five monkeys surrounding him and one monkey on his back (the "Monkey Sketch").  The monkeys in the sketch are engaged in mischievous conduct and the manager appears to be wiping his brow in exasperation.  At the top of the sketch is the hand printed title of

the book, "The One Minute Manager Meets the Monkey" (authored by  Kenneth

Blanchard, William Oncken, Jr. and Hal Burrows and initially published in 1989).  Near

the bottom of the sketch are the words,  "Monkey Management."  The second page of the

excerpt contains a one-line recommendation: "The More You Get Rid of Your People's

Monkeys, The More Time You Have For Your People."   The third page contains another

single sentence recommendation:  "All Monkeys Must Be Handled At The Lowest

Organizational Level Consistent With Their Welfare."  This page includes the

handwritten terms: "Mental Health," "MD," "PA," "Nurses" and "Clerk" written in a

fashion so as to encircle the one-line printed recommendation.  On page four of the

excerpt, this tip is contained:  "Practice Hands-Off Management As Much As Possible

And Hands-On Management As Much As Necessary."  The Heading on page 5 recites,

"A Summary Of Oncken's Four Rules of Monkey Management," Thereafter, the four

rules are set out as proposed methods a manager should utilize in resolving problems

identified with or generated by people working under a manager's supervision.  The fifth

page contains two handwritten notations - "Don't bring the problem without the solution"

and "Time Management."  The final page of the book excerpt sets forth definitions of

three types of "organizational time," again embellished by a few hand-printed notes.

It is not clear how this bit of written material came to be reviewed by various CCA

employees, but at least several of the African American nurses found the sketch to be

offensive and interpreted the drawing as well as the handwritten notations to portray them

as monkeys.  Plaintiffs also claim that on two occasions subsequent to the discovery of

the book excerpt,  the nurses were referred to as monkeys over the jail intercom by two

different CCA employees.

During this same time period, three of the Plaintiffs claim to have seen one or two

CCA employees wearing articles of clothing which bore a depiction of a confederate flag.

One of these employees was restricted from entering the secured area of the facility when

he was discovered to be wearing such an article of clothing.  It is undisputed that neither

of the employees who were seen wearing the offensive insignia worked as supervisors of

any of the Plaintiffs or were members of the management team.  At least one of the

Plaintiffs complains  that she was offended when CCA allowed these employees to wear

such insignia.

Three Plaintiffs testified at their depositions that they witnessed and reported

incidents when improper medical procedures were followed,  such as privacy violations,

alteration of medical records, ignoring inmate complaints, giving inmates improper

medication, or withholding their medication.  Some nurses reported these incidents to

local and corporate supervisors, while others reported the problems to outside agencies,

such as the Indiana Attorney General and  the State Board of Nursing.  Plaintiffs lodged

complaints with CCA concerning security issues within the Jail, such as being required to

escort inmates to various areas of the Jail without the assistance of trained correction

officers, and, as a result of registering these complaints, Plaintiffs allege that they faced

retaliation in the form of disciplinary actions or write-ups. Six of the eight Plaintiffs quit during the one-month period between the final week of September 2006 and the final week of October 2006. One Plaintiff had quit several months earlier and another quit in early 2007. Plaintiffs contend that there was a concerted effort on the part of CCA management to pressure them into quitting. This lawsuit brought in 2008 embodies all these complaints against CCA.

### *Summary Judgment Standard*

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion should be granted so long as no rational fact-finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id*. at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts

-8-

showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.1999).  The moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## *Discussion*

As previously noted, Plaintiffs' Third Amended Complaint consists of twelve separate counts, making our discussion of each of those theories of recovery at least prolix.  Unfortunately, neither CCA nor the Plaintiffs chose to organize their briefs on a count-by-count or plaintiff-by-plaintiff basis.  Except for CCA's separate reference to the claims of Plaintiff Patricia Forrest in which CCA argues that the summary judgment rendered against her in her prior lawsuit precludes recovery by her in this matter, both sides have grouped their arguments into categories without tying them to particular counts or Plaintiffs.  Thus, we begin with an examination of CCA's *res judicata* arguments with respect to Plaintiff Forrest after which we shall conduct a count-by-count analysis of the remainder of Plaintiffs' complaint.

*Plaintiff Patricia Forrest*

CCA contends that *res judicata* bars Plaintiff Forrest from pursuing her claims in this case.  Three requirements must exist for *res judicata* to apply to bar a plaintiff's claim: (1) an identity of the plaintiffs or their privies in the current and prior matter; (2) an identity of the cause of action; and (3) a final judgment on the merits issued in the previous lawsuit by a court exercising proper jurisdiction.  *See Friends of Milwaukee's Rivers and Alliance for Great Lakes v. Milwaukee Metropolitan Sewerage Dist.*, 556 F.3d 603, 606 (7th Cir. 2009); *Cole v. Board of Trustees of University of Illinois,* 497F.3d 770, 772-73 (7th Cir. 2007).  There is no quibbling over the fact that Ms. Forrest and CCA are the same parties who were involved in the first lawsuit in which she asserted theories of race discrimination and retaliation, and no denying that a final judgment was issued in that lawsuit against Ms. Forrest.  However, there is legitimate disagreement about whether that final judgment addressed the merits of all the claims that have been brought in this lawsuit.

There is an identity between the causes of action if the claim in the second lawsuit arises out of the same core of operative facts as the earlier action.  *Cole*, 497 F.3d at 772. The Seventh Circuit has held many times, over the course of many years, that res judicata bars not only claims which have been previously litigated, but those issues which could have been raised in the prior litigation.  *Cole,* 497F.3d at 772-73 (7th Cir. 2007); *see also Kratville v. Runyon*, 90 F.3d 195, 197-98 (7th Cir. 1996); *Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 688 (7th Cir. 1986).  CCA contends that because Ms. Forrest

left her employment prior to her deposition and prior to responding to the summary judgment motion filed in the earlier lawsuit, she could have asserted in that lawsuit each of the claims included in this lawsuit.  Since she did not do so, she is barred from bringing them now.  Ms. Forrest rejoins that she was not required to amend her complaint in the prior litigation to include all claims which accrued after the filing of that complaint and that only those claims arising out of the facts which existed at the time she filed her amended complaint are barred by *res judicata*.

We have found no decision from the Seventh Circuit which specifically addresses whether claims which could have been raised through amendment of the complaint in prior litigation are barred from further pursuit in subsequent litigation.  However, one of our sister courts in this circuit has ruled that because Rule 15 permits a plaintiff to seek leave of court to amend her pleadings and directs the court to freely grant such leave when justice requires, there is little excuse for a plaintiff not to pursue such an amendment when the underlying factual circumstances of the case have shifted or expanded as a result of discovery or due to otherwise newly developed facts.  *See Zurich Capital Markets Inc. v. Coglianese*, 383 F.Supp.2d 1041, 1047 n.2 (N.D.Ill. 2005).  Further, Seventh Circuit precedent recognizes a corollary to the general rule that *res judicata* bars the litigation of matters raised in prior litigation to provide that *res judicata* also "operates to bar litigation of matters that <u>should have been raised </u>in the prior proceeding."  *Harper Plastics, Inc. v. Amoco Chemicals Corp.,* 657 F.2d 939, 945 (7th

Cir. 1981)(emphasis added).

In her first lawsuit, Ms. Forrest sought relief for what she characterized as discriminatory treatment against her by CCA. In attempting to identify the motivation for this alleged disparate treatment, she proffered theories of race, gender and age discrimination as well as retaliation.  The treatment she complained of occurred during and after her reports to CCA management regarding medical improprieties at the Jail and thus clearly implicated claims under a "whistleblower theory" as well.  Only her claim in the case at bar that CCA failed to provide a safe working environment varies enough from the core facts of her first lawsuit to avoid the *res judicata* bar to this action.  However, as will be more fully developed in our discussion of Count XI of the complaint, there is no legal basis for an individual unsafe workplace claim under state or federal law. Consequently, we hold that Ms. Forrest has no remaining claim to assert in this lawsuit and she must be dismissed from this action.

Regarding the claims of the other Plaintiffs, each count alleges as follows:

*Count I:*

> *The Nurses suffered an illegal employment action when they were subjected to intimidation and retaliation for following their nursing professional and ethical responsibilities, including those set out in 848 IAC 2-3-3(1), (4), (6), (7), (10), (11) and (13).*

*Count II*

> *The Nurses suffered an illegal employment action when they were constructively and unjustly terminated for following their nursing professional and ethical*

*responsibilities, including those set out in 848 IAC 2-3-3(1), (4), (6), (7), (10), (11)
and (13).*

All Plaintiffs, with the exception of Karen Cherry, seek relief in both  Count I and
Count II.  CCA characterize these claims as Plaintiffs' "whistleblower" case, responding
that the evidence shows that Plaintiffs took no protected action and that no common law
whistleblower exception exists that would trump the employment-at-will presumption in
Indiana.  Plaintiffs cite the whistleblower protections provided by Indiana statute to
employees of government contractors as the legal basis for this part of their lawsuit, Ind.
Code § 22-5-3-3, but CCA objects on the grounds that Plaintiffs' attempt to invoke the
statutory protections of Ind. Code § 22-5-3-3 at this point in the litigation amounts to an
impermissible amendment to their complaint.  Moreover, CCA contends that even if these
claims are allowed at this late juncture, Plaintiffs have failed to satisfy the requirements
necessary to invoke the statutory whistleblower protections.

We share CCA's view that there is no common law exception to employment at
will in Indiana which protects a whistleblowing employee. *Coutee v. Lafayette
Neighborhood Housing Services, Inc.*, 792 N.E.2d 907, 911 (Ind. App. 2003).  By
enacting Ind. Code § 22-5-3-3, the Indiana General Assembly created a limited statutory
protection for whistleblowing employees of employers who are operating under public
contracts.   But we disagree with CCA's contention that Plaintiffs' reliance on Ind. Code
§ 22-5-3-3 represents an unauthorized amendment to their complaint.  Even with the

Supreme Court's recent tightening of the requirements which a pleading must meet, *see Ashcroft v. Iqbal,* __ U.S. __, 129 S.Ct. 1937 (2009), there is still no pleading requirement which mandates that a plaintiff reference the specific statute allegedly violated by a defendant or relied upon by the plaintiff in seeking an entitlement to relief. *Shah v. Inter-Continental Hotel Chicago Operating Corp.,* 314 F.3d 278, 282 (7th Cir. 2002). Detailed factual allegations are not required and a plaintiff must simply avoid naked assertions, wholesale conclusions and formulaic recitations of the elements of a claim without factual enhancement. *Iqbal,* 129 S.Ct. at 1950. Having been put on notice of the nature of the claim, the Defendants are still under an obligation to "smoke out" the details surrounding the plaintiff's theory. *Shah,* 314 F.3d at 282.

Though Plaintiffs' references in Count I to the Indiana Administrative Code's listing of types of unprofessional conduct for licensed practical nurses was not particularly illuminating,[3] the factual allegations contained in paragraphs 18 through 22 of the Third Amended Complaint, which precede and presumably apply to each of the twelve specific counts, make clear Plaintiffs' claim that they were retaliated against and otherwise penalized for having reported medication errors and other patient related medical malfeasances. CCA cannot convincingly claim surprise at this point; clearly it

---

[3]It might have been more appropriate if Plaintiffs had referenced 848 IAC 2-3-2 instead of 848 IAC 2-3-3 in paragraph 35 of their Third Amended Complaint (which is the sole paragraph comprising Count I) because section 2-3-2 sets forth a list of nurses' affirmative responsibilities as opposed to unprofessional nursing conduct, examples of which appear in section 2-3-3. Nevertheless, a review of both discloses that the statutory provisions are simply mirror images of each other.

has had an adequate opportunity to gain an understanding of the statutory underpinnings of  Plaintiffs' claims.

While we conclude that Plaintiffs have sufficiently alleged their  whistleblower claim, none of them has shown that she took the steps required by Ind. Code § 22-5-3-3 to invoke its protections.[4]  The statute protects employees who report that, in connection with their employer's execution of a public contract, a law or regulation has been broken or public resources misused.  That report to the private employer or to the Attorney General or other appropriate public official must point out a "violation of a state law or rule."  Ind. Code § 22-5-3-3(a).  In their response brief, Plaintiffs broadly assert that they "repeatedly put their complaints in writing in the form of 5-1C reports and other documents," but they provide no substantiation for this assertion.  We find no support in the record for Plaintiffs having made the kind of written reports contemplated by the Indiana statutory requirements which contained their complaints concerning specific laws or rules which they alleged were being broken by CCA.  Accordingly, there is no basis upon which they can recover under Indiana's whistleblower protection statute.

---

[4]We note that Patricia Forrest did file a complaint with the Indiana Attorney General which likely would have qualified her it avail herself of the protections of Ind. Code § 22-5-3-3 or perhaps the First Amendment, through application of 42 U.S.C. § 1983 (discussed in the next subsection of this entry).   However, her written complaint to the Attorney General was filed on December 14, 2005, which date came after she had filed her previous lawsuit, but before it was served on CCA.  As we have previously determined, *res judicata* prevents her from raising any whistleblower type claims arising out of the same core of facts that were not raised in the first lawsuit.

_Count III_:

> _The Nurses suffered an illegal employment action when they were subjected to intimidation and retaliation for exercising their right to speak out on issues of a public concern regarding the operation of Jail #2 by CCA, which right is an exception to Indiana's at-will employment doctrine._

_Count IV_:

> _The Nurses suffered an illegal employment action when they were constructively and unjustly terminated for exercising their right to speak out on issues of a public concern regarding the operation of Jail #2 by CCA, which right is an exception to Indiana's at-will employment doctrine._

All Plaintiffs, again with the exception of Karen Cherry, claim relief in both Count III and Count IV.  Though Plaintiffs' complaint does not label these counts as constitutional claims under the First Amendment, the pleading suffices to put CCA on notice of the nature of their claim.  The state action requirement of 42 U.S.C. § 1983 claims typically shields a  private employer from liability for a violation of an employee's First Amendment rights.  However, when a close nexus exits between the state and a private contractor, the private entity "may be fairly treated as the State itself."  _Wade v. Byles,_ 83 F.3d 902, 905 (7ᵗʰ Cir. 1996).

Wisely, CCA does not challenge Plaintiffs' First Amendment claims on the basis that it was not acting under color of law.  Had CCA made such a challenge, it likely would not have succeeded, because State action may be deemed to have occurred in situations where an activity that traditionally has been the exclusive responsibility of the State, such as imprisoning individuals for the commission of a crime,  has been contracted

-16-

out to a private entity.  *Cooper v. U.S. Postal Service*, 577 F.3d 479, 491-492 (2nd Cir.

2009).  Instead, CCA asserts that Plaintiffs' statements and opinions were not expressed

in their capacity as private citizens; rather their views reflected their roles and

responsibilities as nurse employees.  In *Garcetti v. Ceballos,* 547 U.S. 410 (2006), the

Supreme Court held that, when an employee makes statements pursuant to her official

duties, she is not speaking out on matters of public importance and thus her speech is not

protected by the First Amendment.

Indeed, Plaintiffs admit that in reporting medical improprieties they spoke in the

context of their responsibilities as nurses at CCA.  Their reporting of unsafe conditions at

the Jail to local supervisors or to CCA management would be the same.  The only

Plaintiff who claims that she raised complaints outside the context of her job is Harriet

Ellis, who avers in her affidavit that she made several calls to the Indiana Board of

Nursing to report problems at the Jail.  However, CCA claims that Ellis's sworn statement

somehow conflicts with her previous deposition testimony in which she stated that she

never "filed" anything with the nursing board.   Filing and phoning in complaints

obviously are two different things, which undermines CCA's claim of a conflict in Ellis's

testimony.  However, Ellis's reports of "problems" at the Jail to her state professional is

not the type of public speech which the Supreme Court has deemed to be protected.

Ellis's speech was of the type "which owes its existence to a public employee's

professional responsibilities" and, therefore, is not protected.  *Id*. at 421.  Accordingly,

-17-

none of the Plaintiffs' claims can survive summary judgment as they have been advanced

in Counts III and IV.

*Count V*:

> *CCA intentionally inflicted emotional distress on the Nurses for exercising their legal and ethical responsibilities to report medical and other errors and as part of an effort of CCA to force the Nurses to quit their jobs at Jail #2.*

All Plaintiffs (again except Karen Cherry) assert state law intentional infliction of

emotional distress claims in Count V.  An independent cause of action for intentional

infliction of emotional distress was first recognized by the Indiana Supreme Court in

*Cullison v. Medely,* 570 N.E.2d 27 (Ind. 1991).  Indiana courts shy away from awarding

damages on the basis of this cause of action as an independent tort in employment cases.

*McCreary v. Libbey-Owens-Ford Co.,* 132 F.3d 1159, 1167 (7th Cir. 1997).   To state a

viable claim for infliction of emotional distress,  the culpable conduct must be so

outrageous and atrocious as to be regarded as intolerable within a civilized community.

*Powedertech, Inc. v. Joganic,* 776 N.E.2d 1251, 1264 (Ind. App. 2002).

Plaintiffs complain that they received unfavorable work assignments, were

subjected to shift changes, and received disciplinary write-ups.  They complain that

Caucasian nurses received more favorable treatment, which, along with their own

professional ethical obligations led them to quit their jobs.  However, even assuming the

truth of these matters as alleged, from an objective standpoint and as a matter of law, such

treatment does not rise to the level of being the kind of extreme unconscionable behavior that would exceed the bounds of a civilized society.  Favoritism and unwarranted disciplinary actions, while clearly unpleasant and unwelcome to the recipients of it,  are relatively common workplace complaints, but they do not justify an employee's claim that she had no option other than to quit her employment.  Consequently, CCA is entitled to summary judgment with respect to Count V as to all Plaintiffs.

*Count VI*:

> *CCA materially breached the statutorily-required, non-discrimination clause in the contract it entered into with the consolidated government of Marion County/Indianapolis to manage Jail #2.  The Nurses are third-party beneficiaries of that contract.*

All Plaintiffs join in the claims asserted in Count VI.  CCA's defense is that the nurses lack contractual privity to bring this claim and are not third party beneficiaries of the contract between CCA and the Marion County Sheriff governing operations at the Jail.  The parties agree that, in order for a non-contracting third party to have standing to enforce a contract, three prerequisites must be satisfied: (1) a clear intent by the actual parties to the agreement to benefit another party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms so as to render the intended benefit to the third party.  *Luhnow v. Horn,* 760 N.E.2d 621, 628 (Ind. App. 2001).  Though CCA maintains that the contract explicitly provides that there are no third party beneficiaries, its support for that proposition is based on the

-19-

contract provision (15.5) which forbids <u>assignment</u> to a third party.  This provision

prohibiting assignment of the contract may provide some evidence of the contracting

parties' intent  not to provide any benefit to a third party of the contract, but it does not

state, as asserted by CCA, that under the terms of the contract there are no third party

beneficiaries.  On the other hand, nothing in the contract specifically indicates that the

nurses who were employed by CCA at the Jail were intended to be third party

beneficiaries.

Plaintiffs contend that because the contract provided for CCA to perform a public

service, they have standing to represent the public's interest in enforcing it, citing to

*Schloss v. City of Indianapolis,* 553 N.E.2d 1204 (Ind. 1990) and *State ex rel Cittadine v.*

*Indiana Dept. of Transp.,* 790 N.E.2d 978 (Ind. 2003).

*Schloss* was a cable television subscriber's lawsuit against a city claiming that the

city had exceeded its statutory authority by establishing certain fees.  *Cittadine* involved a

private citizen's suit seeking a writ of mandamus against a state agency.  Plaintiffs'

efforts to establish that they are third party beneficiaries of the CCA contract are not

advanced by either of these cases.  To the extent Plaintiffs' reliance on *Schloss* and

*Cittadine* indicates their desire to assert a separate claim to enforce the contract based on

the public interest, no such claim has been expressly included in their Complaint.  CCA

has properly construed Count VI only to assert a third party beneficiary breach of contract

claim.  Consequently, summary judgment in favor of CCA is warranted on Count VI

again as to all Plaintiffs, for lack of evidence to establish any of the three prerequisites under Indiana law for establishing that Plaintiffs were third-party beneficiaries of the contract between CCA and the Marion County Sheriff.

### Count VII:

> By subjecting the Nurses to intimidation, retaliation, disparate treatment and a racially-hostile work environment, all in an effort to force African-American nurses to quit their employment at the Jail #2 facility so they could be replaced by white nurses, CCA violated Indiana's Fair Employment Practice Act. (IC 22-9-1-1 et seq.)

This Count is brought by all Plaintiffs.  However, the Indiana Civil Rights Act vests authority only in the Indiana Civil Rights Commission to receive, investigate and adjudicate discriminatory practices, and, unless a complaint is filed with the Commission, a finding of probable cause rendered, and a stipulation entered into by the complainant and respondent, no private cause of action exists.  Ind. Code § 22-9-1-16.  In addition, a claim under the Indiana Civil Rights Act is entirely duplicitous of the claims Plaintiffs have raised in Counts VIII, IX and X brought pursuant to federal civil rights laws. Therefore, Summary judgment in favor of CCA must enter as to Count VII.

### Count VIII

> The Nurses were subjected to a retaliation hostile work environment (sic) in violation of the Indiana Civil Rights Act and Title VII and Section 1981 of the Civil Rights Act of 1964.

Each of the Plaintiffs maintains that she is making a claim against CCA in Count

VIII, but it is unclear precisely what that claim is.  We are not sure, for example, what is meant by "retaliation hostile work environment."  In their response brief, under a subheading entitled "Retaliation," Plaintiffs list a number of disciplinary actions taken against them individually and assert that in each instance they were being retaliated against for reporting medication errors or for complaining about their supervisors or other "problems" at the Jail.  In addition, Plaintiffs maintain that the initiation of twelve-hour rotating shifts was undertaken as a retaliatory act.  CCA's goal in taking these actions, according to Plaintiffs, was to force them to quit their jobs.

Ignoring for the moment that these claims are based on little more than Plaintiffs' speculations, we note  that the Indiana Civil Rights Act, 42 U.S.C. § 1981, and Title VII all forbid retaliation based on a plaintiff's report of or complaint about race discrimination.  However, none of these statutes provides a cause of action for retaliation in response to a plaintiff's  report of or complaint about  safety concerns, unethical behavior, unprofessional language or other general problems within the workplace. Plaintiffs do not contend, in Count VIII or elsewhere, that they were retaliated against for reporting race discrimination, nor do they attempt to counter CCA's contention that none of them filed a grievance or a 5-1C form relating to a claim of race discrimination, nor was this subject raised in any complaints made to the regional administrator or company headquarters.  Without being able to establish that their participation in protected activity gave rise to CCA's allegedly punitive actions against them, Plaintiffs' retaliation claims

in Count VIII fail.

*Count IX:*

> *During their employment at Jail #2, the Nurses were subjected to disparate treatment when compared to Caucasian nurses and other white employees, which disparate treatment is in violation of Indiana Civil Rights Act and Title VII and Section 1981 of the Civil Rights Act of 1964.*

*Count X:*

> *The Nurses were subjected to a racially hostile work environment in violation of Indiana Civil Rights Act and Title VII and Section 1981 of the Civil Rights Act of 1964.*

Each Plaintiff claims to have been the victim of disparate treatment and also forced by CCA to endure a hostile work environment, thus entitling them to recover under Counts IX and X.

In order to prevail on a claim of disparate treatment, a Plaintiff must present evidence either directly showing an employer's discriminatory intent or by using indirect evidence and undertaking the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).  *Paz v. Wauconda Healthcare & Rehabilitation Centre*, 464 F.3d 659, 665 (7th Cir.2006).  Typically, the direct method of proving discrimination amounts to evidence of an admission of discriminatory animus. *Phelan v. Cook County,* 463 F.3d 773, 779 (7th Cir. 2006).  However, the Seventh Circuit has held that "[a] plaintiff can also prevail under the direct method of proof by

constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.* (quoting *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004).

Plaintiffs contend that they have adduced circumstantial evidence sufficient to make their case directly. They point to three facts which, according to them, are sufficient to establish an inference of discriminatory intent on the part of CCA: (1) the "Monkey Sketch;" (2) the verbal reference to nurses as "monkeys" by two employees utilizing the Jail intercom; and (3) CCA's tolerance of two employees who were allowed to wear clothing bearing the insignia of a confederate flag.

We accept that references to any person as a monkey are objectively derogatory and distasteful, and that such a depiction aimed at an African American person is justifiably perceived as a particularly pejorative and racially tinged reference. The reference to nurses as monkeys broadcast over the internal loudspeaker system at the Jail qualifies as evidence of a hostile work environment, if it can be shown to have occurred on a regular basis or that it was otherwise tied in some manner to an adverse employment action against the employee. Here, no evidence exists to establish that such a reference was a commonplace event or that the persons making the offensive comment had any supervisory authority over any Plaintiff. In fact, the persons who communicated this offensive message over the intercom at the Jail apparently were employees who worked in the corrections area as opposed to the medical services part of the facility where

Plaintiffs were employed.  Stray remarks by co-workers or even a random utterance of a racial epithet are insufficient to support a hostile environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  Thus, the intercom statements as alleged by Plaintiffs, assuming they occurred as Plaintiffs assert, fall short as probative evidence of the employer's intent in support of a histile environment claim.  *See Walker v. Doctors Hosp. of Hyde Park,* 110 F.Supp.2d 704, 711 (N.D. Ill. 2000).

As for the "Monkey Sketch," the evidence adduced makes clear that the document was neither created nor maintained for any untoward or authorized purpose.  The sketch was depicted on a single page of a larger book (a management theory text), the authors of which apparently utilized monkeys to illustrate annoying problems which a manager typically confronts in the workplace and may be required to resolve.  Had the sketch been removed from the book as a single page and had it been annotated in some manner that specifically targeted African Americans or one or more of the Plaintiffs, there might be some basis on which to find  a more nefarious intent attributable to CCA.  The sketch was but a single part of a brief excerpt consisting of several pages which included certain handwritten notes evidencing that the person who had retained the excerpt, Ms. Copely, intended merely to utilize and apply the management lessons according to the book's authors' recommendations.  There is simply no objective basis on which to conclude that the sketch was evidence of a discriminatory animus on the part of Ms. Copely or CCA.

Equally telling is the lack of any mention in Plaintiffs' response brief that any adverse action was ever taken against any one of them by Ms. Copely.

This leaves the claim by Plaintiffs that two CCA employees were seen by certain Plaintiffs to be wearing an article of clothing containing a depiction of the confederate flag.  The evidence establishes that neither of these individuals supervised Plaintiffs nor was either a CCA management employee who would have had authority in the workplace over Plaintiffs. While the display of a confederate flag on a shirt or other article of apparel may indicate that the wearer is racially insensitive and may in some circumstances be worn for intimidation purposes, there is no allegation or evidence here to establish that either of the offending coworkers wore the clothing on more than one occasion or that any intimidation was intended by them or for that matter actually perceived as such by Plaintiffs.  One of the Plaintiffs simply said she found it offensive. Courts have not found that instances involving the infrequent wearing of clothing depicting the confederate flag create a hostile environment.  *Carter v. Daehan Solutions Alabama,* LLC, 2010 WL 431221 (N.D. Ala. Feb. 1, 2010); Bishop *v. Tyson Foods, Inc*., 660 F.Supp.2d 1004 (W.D. Ark 2009).  Without evidence of a nexus between the coworkers choice of clothing and some adverse action against or reaction by Plaintiffs, we cannot conclude that CCA's failure to make these employees leave the workplace or change their clothes constituted evidence to establish that Plaintiffs were the targets of disparate treatment.  Thus, Plaintiffs' claim that their evidence suffices to directly prove

race-based discrimination against them is unavailing.

To survive summary judgment under the burden-shifting method of proof for a disparate treatment claim, a plaintiff must begin by establishing a prima facie case consisting of the following elements: (1) she is African American; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated non-African Americans received more favorable treatment. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir.2006). In this case, elements three and four are disputed by the Defendant.

CCA claims that Plaintiffs suffered no adverse employment action, but Plaintiffs maintain that CCA's actions were aimed at making their working environment so hostile that they were left no choice but to quit, which was for each, they say, a constructive discharge. The standard for proving constructive discharge is even more demanding than that required to establish a hostile work environment. "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Whittaker v. Northern Illinois University,* 424 F.3d 640, 648-49 (7th Cir. 2005)(quoting *Tutman v. WBBM-TV, Inc./CBS, Inc*., 209 F.3d 1044, 1050 (7th Cir.2000). Accordingly, where there is insufficient evidence to support a hostile work environment claim, neither will a disparate impact claim based upon an allegedly constructive discharge will not survive.

To make out a viable hostile environment claim, Plaintiffs must prove: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). Whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, including the frequency of the conduct complained of; its severity; whether it was physically threatening or humiliating; and whether it unreasonably interfered with an employee's work performance. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

Plaintiffs' evidence fails to establish a racially hostile work environment at the Jail. In addition to the three circumstances which Plaintiffs cite as direct and circumstantial evidence of discrimination, discussed above but necessarily discounted, Plaintiffs complain that they were subject to unfounded, trumped up disciplinary write-ups, to retaliation after reporting medication errors made by Caucasian nurses and supervisors, and unfairness based on Caucasian nurses receiving greater leniency with regard to leave and shift changes than did African American nurses. They also reference a statement made by a CCA doctor to one of the nurses as evidence of a hostile work

environment.  The cumulative effect of these events ultimately resulted in the nurses'

decisions to quit.  Accepting these allegations as true, as we must at this stage f the

proceedings, they do not individually or together establish a legally cognizable hostile

work environment.  The weakness of their evidence is exacerbated by the fact that, for the

most part, it gives rise to nothing more than their speculations as to a basis of recovery.

CCA has established that its practice was to discipline Caucasian employees as

well as African American employees for similar activities, including for their roles in

medication errors.  In contrast, Plaintiffs are left merely to speculate as to the reasons they

were disciplined, stating that they "believe" their discipline was pretextual without ever

providing a factual foundation for that belief.  Evidence of Caucasians who supposedly

received more favorable treatment with regard to discipline is based only on hearsay

rather than any reliable records or direct testimony.  Further, the change in rotational shift

policy objected to by Plaintiffs, undeniably effected all nurses, not just the African

American nurses.

CCA does not deny that the facility doctor made an impertinent, sarcastic and

offensive response to a nurse's question, when he answered "black as Coal," after being

asked by a nurse what the first name was of an inmate whose last name was Cole.

Plaintiff Jones, to whom the remark was directed, filed a 5-1C complaint indicating that

she was offended by that comment, and after being informed of Jones's complaint, the

doctor summoned Jones to his office to apologize and to request that in the future she tell

him directly if something he said offended her.  Though the doctor's comment was clearly

inappropriate, it is not evidence of an environment at CCA that was so inhospitable as to

alter the Plaintiffs' terms of employment.  Neither Plaintiffs' claims of racially disparate

treatment nor their claims of being subjected to a hostile work environment survive

summary judgment.

_Count XI_ :

> *The facts set forth herein show that CCA failed to provide the Nurses a safe*
> *working environment as required by state and federal law.*

All Plaintiffs assert the claim laid out in Count XI, which purports to impose

liability on CCA for its failure to provide a safe workplace.  However, workplace safety

standards are the exclusive province of the Indiana Occupational Safety Standard

Commission ("IOSHA").  IOSHA's adoption of the federal OSHA regulations precludes

a private right of action based on a failed duty to provide a safe workplace.  *Slaughbaugh*

*v. Willies Development, Inc.*, 654 N.E.2d 746, 749 (Ind. App. 1995).  Plaintiffs admit as

much in their response brief, but maintain that their claim is actually brought pursuant to

Ind. Code § 22-5-3-3, the Indiana whistleblowing statute, which we have previously

discussed.  More precisely, Plaintiffs contend that this cause of action is premised on their

right to speak out and express their concerns regarding a safe workplace.

Our prior decision on Plaintiffs' claims under the whistleblower statute controls

here as well.  We do not need to and shall not  repeat that discussion in this context.

-30-

Because this count is duplicitous of other claims which have been found lacking, we hold

for the same reasons that Count XI also fails and that summary judgment must be entered

in CCA's favor.

Count XII:

> By violating its own manuals relating to the operation of its medical facilities and
> security at Jail #2, and intimidating and retaliating against the Nurses when they
> attempted to comply with said manuals, CCA breached an employment contractual
> duty CCA owed to the Nurses.

All Plaintiffs join in this breach of employment contract claim, relying on the case

of *Indiana Dept. of Highways v. Pigg,* 580 N.E.2d 673 (Ind. 1991) to overcome the fact of

their having previously signed acknowledgments indicating that they were not subject to

any employment contract as well as in an effort to distinguish their situations from long,

well established state law precedent holding that employee handbooks do not constitute

unilateral employment contracts.  *Orr v. Westminster Village North, Inc.,* 689 N.E.2d 712,

722 (Ind. 1997).  Plaintiffs' reliance on *Pigg*, however, is unavailing.

In *Pigg*, the Indiana Supreme Court ruled that an employee of the State Highways

Department who had been fired and who, after hearings were held on his administrative

appeal of that firing, sought judicial review of the agency determination.  *Pigg,* 580

N.E.2d at 675.  The State argued that the employee was an employee at will and not

entitled to judicial review nor was he entitled to invoke the provisions of the Indiana

Administrative Adjudication Act.  *Id*. at 674.  The court disagreed with the State's

position, finding that the employee was entitled to judicial  review because the agency effectively had promised as much when it set forth specific procedural due process rights that went beyond those available under Indiana statutes.  *Id.*  Plaintiffs here contend that because CCA was operating the Jail in the government agency's stead, they are entitled to rely on CCA's employee handbook and seek judicial relief because those promises were not kept.

The *Pigg* decision clearly dealt with procedural due process rights and the later repealed  Indiana Administrative Adjudication Act.  It is not a decision that stands for the proposition that an employee handbook provides an employee with substantive rights which can be enforced by judicial review.  Further, unlike *Pigg*, the employee handbook at issue here provides no protections beyond those available under Indiana law.  It is undisputed that each Plaintiff, upon accepting employment with CCA, signed a statement indicating that she understood that she was an employee at will and had no contractual rights under any employment agreement.  Count XII thus lacks factual and legal merit, making CCA entitled to summary judgment on this claim.

## *Conclusion*

For the reasons explicated in this entry, summary judgment in favor of CCA is appropriate as to all plaintiffs and all counts in the Third Amended Complaint.  Therefore, Defendant's Motion For Summary Judgment (Doc. # 54) is GRANTED, and a separate

judgment in favor of CCA and against Plaintiffs, jointly and severally shall enter.

IT IS SO ORDERED.

Date:   06/21/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies To:
John T L Koenig
BARNES & THORNBURG LLP
jkoenig@btlaw.com

Adam  Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Paul K. Ogden
ROBERTS & BISHOP
pogden@roberts-bishop.com

Kenneth T. Roberts
ROBERTS & BISHOP
ktrobatty@aol.com